**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

TRACEE FULTZ,                                  )
                                               )
                    Plaintiff,                 )
                                               )        Civil Action No. 05-01542
v.                                             )        Judge Nora Barry Fischer
                                               )
LIBERTY LIFE ASSURANCE                         )
COMPANY OF BOSTON,                             )
                                               )
                    Defendant.                 )

**MEMORANDUM OPINION**

## I.      Introduction

Plaintiff Tracee Fultz (hereinafter "Fultz" or "Plaintiff") filed the instant civil action against

the Defendant Liberty Life Assurance Company of Boston (hereinafter "Defendant" or "Liberty")

pursuant to the Employee Retirement Income Security Act ("ERISA") of 1974, as amended, 29

U.S.C. § 1001 *et seq.*, including ERISA § 502, 29 U.S.C. § 1132 (2004), challenging the Defendant's

decision to discontinue her long-term disability ("LTD") benefits under the terms of the Defendant's

LTD plan, Policy No. GF3-860-0385280-01 (hereinafter the "Policy" or "LTD plan").  Defendant

provided long term disability insurance to the employees of Amgen, Inc. ("Amgen"), the Plaintiff's

employer at the time of her disability.  Presently pending before the Court for consideration are the

parties' cross motions for summary judgment [27 & 30].  After considering all the parties' filings,

including the parties' supplemental briefs, and oral argument heard on the motions by the Court at

a status conference held on November 20, 2007, the Court DENIES Liberty's motion and GRANTS

the Plaintiff's motion.

## II.     Factual Background[1]

### A.     The Policy

Defendant Liberty insured the LTD insurance for the employees of Amgen pursuant the Policy, effective January 1, 1998 (P-1). The Defendant issued the Policy to Amgen in California which explicitly states that the governing jurisdiction is California and the Policy is subject to the laws of that state. (P-1). The Plaintiff participated in the Policy as a result of her employment with Amgen as a tax manager during which time she was covered by the plan. The LTD plan was administered and underwritten by Liberty. (P-1). The Policy provided LTD benefits for Covered Persons who are "unable to perform all of the material and substantial duties" of her occupation because of injury or illness. (P-5). The payment of benefits can begin after a waiting period of sixty (60) days. (P-3). Benefits are payable until the insured attains the age of 65 in an amount equal to 66-2/3% of the Basic Monthly Earnings, not to exceed $15,000.00 per month. (*Id.*). At the time disability was claimed by the Plaintiff, her basic earnings were $8,333.32 per month. (CF-557). According to the Plaintiff, pursuant to Section 4 of the Policy, titled "Disability Income Benefits," the Plaintiff was to receive benefits for the period of her disability if she continued to give Liberty proof of her disability and of regular attendance by a physician. (P-10).

Under the Policy, there is an exclusion for a "Pre-Existing Condition," which is defined as "a condition resulting from an Injury or Sickness for which the Covered Person is diagnosed or received treatment within three months prior to the Covered Person's Effective Date." (P-19). The

---

[1]     Except where otherwise noted, the following facts are undisputed and are taken from the group disability income policy administered by Liberty (Declaration of Paula McGee, Docket No. 45), and the Plaintiff's claim file maintained by Liberty. Hereinafter, page citations to the Policy and claim file, as contained in the Evidentiary Appendix (Docket Nos. 41 & 42), will be abbreviated as, P-[page number], and CF-[page number], respectively.

policy exclusion for pre-existing condition states:

> This policy will not cover any Disability or Partial Disability:
> 1. which is caused or contributed to by, or results from a Pre-Existing Condition; and
>
> 2. which begins in the first 12 months after the Covered Person's Effective Date.

(*Id.*). The term "treatment" is defined as "consultation, care or services provided by a Physician including diagnostic measures and taking prescribed drugs and medicines." (*Id.*). These provisions applied to the Plaintiff when she became a Covered Person on her date of hire, March 24, 2003. The three month "look back" period defined in the Policy would extend back to December 24, 2002. Pursuant to Section 7 of the policy, Liberty possessed the right, at it own expense, to have the Plaintiff examined by a physician of its choice, and this right "may be used as often as reasonably required." (P-24). Under the Policy, Fultz was required to provide medical proof of continued disability upon request by Liberty. (CF-10, 24).

Pursuant to the terms of the Policy and the LTD plan, Liberty had discretionary authority to make interpretations and to determine eligibility for benefits. (P-22). Specifically, the Policy states that Liberty "shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of the policy and benefit eligibility shall be conclusive and binding." (P-22). Morever, the policy provided that any officer of Liberty can approve a change to the policy, subject to notice. (*Id.*). The policy was non-contributory and contained an integration clause which stated that it was the complete contract between the parties. (P-7, 22). The policy did not state that Liberty possessed the authority to conduct subsequent reviews of disability claims after benefits had previously been

awarded and paid for a period of time.

**B.      Pre-LTD Benefits Period**

On March 23, 2003, the Plaintiff was hired by Amgen as a tax consultant (CF-557).  Her effective date of coverage under the group LTD policy was March 24, 2003. (*Id.*).  She worked through June 27, 2003.  (CF-555).  She stopped working on June 28, 2003 when she was hospitalized for a low white blood count. (*Id.*).  She filed an Application for Disability Benefits on July 10, 2003, as a result of Systemic Lupus Erythematosus ("SLE"), which was diagnosed in April of 2003.  (*Id.*).  Dr. Ernest Brahn, M.D., her treating physician at the time, certified that she was suffering from disabling SLE.  (CF-546).  An application for disability benefits was filed on July 10, 2003 under Amgen's short term disability policy. (CF-555).  The Plaintiff was granted short term disability benefits effective June 30, 2003. (CF-545). Under the terms of the policy, these benefits could last up to sixty (60) days depending on whether the Plaintiff recovered, due to the elimination period under the policy.

The Plaintiff's claim was referred to the Defendant's disability claims department on August 12, 2003 for a determination of whether the Plaintiff was entitled to LTD benefits. (CF-544).  The claim was transferred to a case manager on September 3, 2003 for consideration of payment under the LTD policy.  (CF-79-80, Log Note 1).  The case manager assigned to the claim was Monique Gunn, the same disability case manager who eventually granted disability benefits to Fultz.  (CF-544).  The Plaintiff was notified of this transfer by letter dated September 4, 2003. (CF-543). On September 9, 2003, the first discussion, via email, occurred regarding the application of the pre-existing exclusion to the Plaintiff's claim. (CF-542).  On September 15, 2003, Fultz was notified that her claim was being evaluated under the pre-existing condition exclusion.  (CF-536).

4

Upon request by Liberty, the Plaintiff provided it with a list of her treating physicians and other health providers. (CF-42-43, 510-511). Specifically, on September 16, 2003, the Defendant sent requests for treatment records to Dr. Brahn, Dr. John Franklin, Dr. Amy Kao, and Dr. Richard Crane, for the period of December 24, 2002 to September of 2003. (CF-532-535). Liberty did not, however, request the records from the Plaintiff's prior primary care physician, Dr. Barton Inkeles, or pharmacy records showing her prior medications. (CF-42).

December 24, 2002 marked the beginning date of the three month "look back" period based upon the Plaintiff's hiring date of March 24, 2003. The Defendant received medical records from Dr. John Franklin, a heptologist who treated the Plaintiff during the years of 2002 and early 2003, and records from the Magee-Women's Hospital Lupus Center, where the Plaintiff received treatment after she started her disability leave and relocated to the Pittsburgh area. (CF-470-497, 503-509). The records stated that the Plaintiff had been diagnosed and treated for autoimmune hepatitis ("AIH") in 2001, but was not formally diagnosed with SLE until April, 2003.

Plaintiff's file and records were received and reviewed by Monique Gunn, the Disability Case Manager assigned to her claim. (CF-77). Ms. Gunn entered a claim note in Fultz's file on October 8, 2003, in which she stated that the treatment which Fultz received during the pre-existing period was not for the condition for which she had claimed disability. (CF-77 (Claim Note 10)). On October 14, 2003, another note was entered in Fultz's file noting that a diagnosis of SLE had not been made during the exclusionary period and the condition for which she had received treatment for during the exclusionary period was not the same or related to the current condition for which she has claimed disability. (CF-76 (Claim Notes 12 and 13)).

Subsequently, on October 17, 2003, a claim review was conducted by Ms. Gunn, Katherine

Simmons, a nurse case manager, Nita Chandra, and Karin Ross. (CF-75-76). It was determined that the case should be referred to a rheumotologist for a peer review to determine whether the pre-existing AIH was related to the SLE. (*Id.*). Dr. Reynold Karr, a consultant of Liberty, performed the peer review. (CF-446-452). On November 3, 2003, Liberty received a report from Dr. Karr stating that the Plaintiff had been diagnosed with SLE in April of 2003 and that she had a history of AIH which had been treated successfully with Imuran and Predisone in 2001 (CF-460-465). He noted that both AIH and SLE were autoimmune phenomena which can cause a patient diagnosed with one of them to be at greater risk to develop the other condition. (CF-451-452). Dr. Karr concluded that although there was a relationship between AIH and SLE, it was medically incorrect to say that one condition causes the other, and that it was more appropriate to state that the two disorders are separate conditions. (CF-464-465). On November 7, 2003, Ms. Gunn entered a note in the Plaintiff's file regarding Dr. Karr's report. (CF-73 (Claim Note 18)). It stated that Dr. Karr was asked whether AIH causes or contributes to the development of SLE and it was reported that he concluded that it cannot be determined whether one actually causes the other. (*Id.*). It was also noted in Fultz's file that a determination had been made that the two conditions were not the same or related and that the pre-existing review was completed. (CF-72 (Claim Notes 19 and 20)).

Before an award letter is sent, it is a requirement of the Defendant that the decision be reviewed by a manager. ((Deposition of Susan Mills ("Mills Depo."), Docket. No. 41-11, at page ("p.") 86, lines ("ll.") 13-20). Thus, the Fultz determination was reviewed and signed off by Ms. Gunn's manager. (Mills Depo. p. 86, ll. 21-24). In awarding Fultz benefits under the Plan, Liberty concluded, based on the information available to it at that time, that she did not suffer from a pre-existing condition which led to her condition of SLE.

### C.    Award of Benefits

Following its review, Ms. Gunn sent the Plaintiff an award letter dated November 11, 2003. (CF-88-89). Liberty granted monthly LTD benefits in the amount of $5,555.82. (CF-89). Pursuant to the requirements of Section 4 of the policy, the letter also informed the Plaintiff that her claim would be evaluated periodically to insure that she continued to meet the terms of the policy's long term disability provisions. (*Id.*). The letter did not state, however, that Defendant possessed the ability to reinstate a review of the pre-existing exclusion. The LTD benefits were paid by Liberty to Fultz, with an initial benefit date of August 29, 2003, the date following the expiration of the 60-day waiting period under the Policy (P-3). Liberty paid the Plaintiff benefits for the remainder of 2003 and 2004. During that time, the Defendant continually requested medical records from Plaintiff's physicians apparently to confirm that she continued to meet the definition of disability under the Policy, and Plaintiff complied. The benefits were reduced to $3,981.82 per month on the basis of an award of Social Security Disability benefits. (CF-85-86).

In June of 2004, Teisha Doyle assumed the management of Plaintiff's claim from Ms. Gunn. (CF-39). The claim file indicates that the Plaintiff's medical condition was continually monitored after the approval of her benefits. Initially, Ms. Gunn and Ms. Doyle had performed this function. (CF-36-39, 68-71). On September 24, 2004, a note was made in the file that the file was "out to TCMS."[2] (CF-35). The file was sent to TCMS and the handling of the claim was then assumed by Susan Mills, a TCMS consultant. (CF-35 (Claim Note 56)). There is no claim note or other notation in the claim file as to the reason for the referral to TCMS.

---

[2] "TCMS" stands for Technical Claims Management Service.

**D.      Discontinuance of Benefits and the Plaintiff's Appeal**

On October 14, 2004, the Plaintiff's file became the subject of a TCMS review. (CF-35)(Claim Note 58)).  A TCMS review is a special type of review performed by a more senior and experienced claims management personnel.  (Mills Depo. p. 21, ll. 3-5; Mills Deposition Exh. 3). Claims are selected for this type of review either through an automated selection process, which considers diagnostic criteria, or because of a manual referral due to an assigned case manager's uncertainty of whether he or she fully understands the issues of a certain claim and requests assistance from a manager or from a TCMS specialist. (Mills Depo. p. 23, ll: 9-14).  There are no records or any specific documented reason for the referral of the Plaintiff's claim file to TCMS. (*Id.* at p. 39, ll. 10, 16-18; p. 42, ll. 21-25; Defendant's Answers to the Plaintiff's First Set of Interrogatories ("Interr.") at ¶ 2).  In fact, the claim log provides no basis upon which the TCMS referral was made.  (Mills Depo. p. 58, ll. 3-7).

Susan Mills, the TCMS consultant assigned to the Plaintiff's claim, testified that there were factors present in the Plaintiff's claim which were consistent with a referral to TCMS under the Defendant's procedures, although no such reasons were documented in the claim file.  (Mills Depo. at p. 41, ll. 21-25, p. 42, ll. 3-5, 12-25; Interr. at ¶ 2).  There are reasons in the Policy, Procedure, and Exceptions to allow for TCMS review.  (Mills Depo. p. 34, ll. 14-16, p.35, ll. 7-12, 20-24).  Ms. Mills speculated as to how the claim could meet the following factors warranting TCMS review: (1) it involved physical complaints which were primarily subjective in nature; (2) it involved multiple treating physicians; (3) the claim involved both physical and mental symptoms; and (4) the TCMS referral occurred after the receipt by Liberty of the Plaintiff's reports from neuropsychological testing. (Interr. at ¶ 2).  Ms. Mills opined that she believed that benefits were not approved correctly

or according to the terms of the policy. (Mills Depo. p. 24, ll. 21-25).

During a TCMS roundtable discussion held on October 14, 2004, it was discussed whether the Plaintiff's prior claim manager properly evaluated the claim and that it appeared that the Plaintiff's SLE condition may have been a pre-existing condition (CF-35 (Claim Note 58)). The roundtable review concluded that: (1) Fultz has been treated for symptoms which led to the diagnosis of SLE; (2) she had received positive anti-nuclear antibody ("ANA") results in lab reports from January 8, 2003 which are consistent with SLE; and (3) Dr. Franklin, her treating physician at the time period before coverage, had indicated an impression of SLE in an handwritten note in his January 29, 2003 treatment notes. (CF-35 (Claim Note 58)).

After the roundtable discussion, it was decided that additional medical records, which had not been obtained for the first review would be requested in addition to the Plaintiff's pharmacy records from Eckerd Pharmacy and CVS Pharmacy. (CF-247-253). Subsequently, Liberty received these pharmacy records, which showed that the Plaintiff had been taking anti-inflammatories and steroids during January, February, and March of 2003. (CF-178-179). Liberty also received medical records from Dr. Inkeles Barton, one of her treating physicians in New York. (CF-222-225). On December 14, 2004, during a telephone call between Ms. Mills and the Plaintiff, for the first time, the Plaintiff was notified that the Defendant was reconsidering her claim on the basis of the pre-existing condition exclusion. (CF-33-34, Phone Note 18). During this conversation, Ms. Mills informed the Plaintiff of her belief that the pre-existing condition exclusion was applicable to her condition based upon her review of the medical evidence and her disagreement with the prior case manager. (*Id.*). Ms. Mills did not inform Fultz that the wrong question was asked of Dr. Karr or that her benefits were not approved correctly. Rather, she informed Plaintiff that she had come to a

different conclusion based on the medical evidence in the claim file. (*Id.*).

The Plaintiff's file was then referred to Dr. Robert Millstein, one of the Defendant's consulting physicians, for a review of whether the Plaintiff had received treatment for symptoms of SLE during the exclusionary period. (CF-181, 185). On January 24, 2005, Dr. Millstein prepared a memorandum report summarizing his review. (CF-186-191). In his report, Dr. Millstein found that Fultz had been treated for symptoms relating to SLE, and not for the conditions the treating physicians diagnosed, during the three months prior to her coverage. He pointed to evaluations by at least two physicians that included exams, diagnostic testing, and treatment with anti-inflammatories and steroids. (CF-186-187). He also noted that on January 6, 2003, Dr. Franklin had ordered lab tests and liver panels, the results of which were consistent with a finding of SLE. Following those results and his examination, he specifically listed SLE as one of the impressions of the Plaintiff's condition. (CF-188-189). Furthermore, Ms. Mills could not recall if Dr. Millstein was asked whether the signs and symptoms of the Plaintiff could be attributed to any other diagnosis. (Mill Depo. p. 81, ll. 11-17).

On January 24, 2005, following Dr. Millstein's report, Liberty decided to obtain an independent peer review analysis of the claim. (CF-171-172). During a telephone conversation on January 27, 2005 between Susan Mills and the Plaintiff, the Plaintiff stated that her rheumatologist has been unable to determine whether her symptoms were the result of SLE, "out of control sugars," or withdrawal of steroids. (CF-185). Thereafter, on February 4, 2005, an independent peer review evaluation was requested of Dr. Kismet Collins, a board certified rheumatologist. Specifically, he was requested to determine whether she received treatment for SLE during the exclusionary period. (CF-171-172). Dr. Collins was provided with the definition of "treatment" as contained in the

Policy. (CF-171). Dr. Collins was then asked to include in his report whether the Plaintiff's symptoms could have been the result of "out of control sugars" and/or withdrawal of steroids. (CF-172). Dr. Collins was not asked whether the signs and symptoms exhibited by the Plaintiff could be attributed to any other diagnosis. (Mill Depo. p. 83, ll. 4-10).

On February 24, 2005, the Defendant received Dr. Collins' report, which stated that Fultz had received treatment for SLE during the three month exclusionary period. (CF-151-158). Specifically, he found:

> This claimant did receive treatment for symptoms of Systemic Lupus prior to March 24, 2003, which were caused by SLE. She was treated for arthritis with Vioxx 1/02/2003, and had a history of documented leukopenia, positive ANA, and positive dsDNA. The sum of these four observations would give her a medically reasonable diagnosis of Systemic Lupus Erythematosus on this date. Systemic Lupus often does not always present itself in its "full blown" form. For example, it may present as idiopathic thrombocytopenic purpura, or as discoid lupus only, and only develop into the full form of Systemic Lupus at a later date.

(CF-154-155). Dr. Collins also concluded that the Plaintiff's symptoms were not attributable to "out of control" sugars or the withdrawal of steroids. (CF-155-156). He concluded that "both the leukopenia and the elevated ESR strongly suggest she had marked systemic activity due to SLE at that time [January - February 2003]." (CF-147).

On February 24, 2005, the Defendant sent the Plaintiff a determination letter advising her that a second review of her claim had been completed with regard to the pre-existing condition exclusion under the Policy and it was determined that her disability was due to a pre-existing condition; therefore, her benefits would end on February 28, 2005. (CF-52, 157-159). The letter summarized the medical records that had been reviewed in making the decision. (*Id.*). It further advised the Plaintiff of her right to request a review of the determination and discontinuance of benefits and the

procedures for such a review. (*Id.*).

The Plaintiff was given the opportunity, according to ERISA appeal guidelines, to provide additional medical documentation, which she felt, would support her claim. Accordingly, the Plaintiff sought representation regarding the discontinuance of her benefits.

On February 23, 2005, Plaintiff's counsel sent a request to the Defendant for a copy of the Plaintiff's claim file, which was sent by Defendant on March 2, 2005. On May 12, 2005, counsel for Plaintiff sent another letter to the Defendant seeking any additional records. (CF-138-139). Counsel also outlined in his letter the Plaintiff's challenge to the Defendant's interpretation of the Plaintiff's claim and medical history. Liberty responded that it based its decisions on the fact that the Plaintiff "received treatment for the symptoms of SLE, in the form of medications," and thus, she does not meet the provisions of the LTD policy (CF-136-137).

On August 12, 2005, the Plaintiff's counsel sent Liberty a follow up letter, which was received on August 23, 2005, stating that the Plaintiff was appealing the Defendant's decision to discontinue her receipt of benefits under the Amgen LTD Policy. (CF-57-62). The Fultz file was then referred to Liberty's Appeals Review for evaluation. (CF-44-45). On September 2, 2005, the Defendant issued its determination upholding the discontinuance of the Plaintiff's benefits. (CF- 46-51).

The Policy does not contain any specific provision for a review of a prior determination regarding the pre-existing condition exclusion. Furthermore, Ms. Mills, as a TCMS consultant employed by the Defendant, does not believe that there is any limitation on the number of times the Defendant can perform pre-existing reviews. (Mills Depo. p. 84, ll. 17-22, p. 85, ll. 19-21).

## III.    Procedural History

There is no dispute that the Plaintiff has exhausted all of the Defendant's appeal procedures and her administrative remedies.  Accordingly, she filed the instant action on November 7, 2005 before the Honorable Joy Flowers Conti, alleging that the Defendant wrongfully terminated her benefits pursuant to § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) of ERISA, and claiming relief for benefits allegedly due on a monthly basis after February 28, 2005. (Docket No. 1).   On January 13, 2006, Defendant filed an answer to Plaintiff's complaint. (Docket No.  4).   On August 25, 2006, Plaintiff and Defendant filed a cross motions  for summary judgement.  (Docket Nos. 12 & 14).  On December 19, 2006,  Judge Conti denied both motions without prejudice and scheduled a brief discovery phase that would close on February 20, 2007.  (Text Entry Dec. 19, 2006).  On April 24, 2007, the case was reassigned to this Court.  (Text Entry April 24, 2007).  A status/settlement conference was held on April 26, 2007.  (Docket No. 26).  On May 25, 2007,  the parties filed renewed cross motions for summary judgment.  (Docket Nos. 27 & 30).  On June 16, 2007, the parties filed a joint statement of material facts.  (Docket No. 39).  The Court denied both motions without prejudice on September 20, 2007, ordering both parties to resubmit their motions and briefs citing relevant California case law.  (Docket No. 42).  The parties filed a joint motion for clarification and reconsideration on October 16, 2007, within which the parties agreed to abide by federal common law in the interpretation of the subject contract.  (Docket No. 43).  Thereafter, the Court modified its previous order given this agreement.  (Docket No. 44).  On November 15, 2007, the parties filed supplemental briefs which cited applicable California federal and state court interpretation of pre-existing condition exclusions.  (Docket Nos. 46 & 47).

**IV.     Standard of Review**

**A.     Summary Judgment Standard of Review**

Summary judgment may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact.  *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986).

In evaluating the evidence, the Court must interpret facts in the light most favorable to the non-moving party, and draw all reasonable inferences in their favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).  Initially, the burden is on the moving party to demonstrate that the evidence in the record creates no genuine issue of material fact. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004).  The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 249.  "The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment." *Turner v. Leavitt*, Civil Action No.

05-942, 2008 WL 828033, at *4 (W.D. Pa. March 25, 2008) (citing *Horta v. Sullivan*, 4 F.3d 2, 8

(1ˢᵗ Cir. 1993) (citing10 WRIGHT AND MILLER, FEDERAL PRACTICE § 2721 at 40 (2d ed.1983)));

*Pollack v. City of Newark,* 147 F. Supp. 35, 39 (D.N.J. 1956), *aff'd*, 248 F.2d 543 (3d Cir. 1957),

*cert. denied*, 355 U.S. 964 (1958) ("in considering a motion for summary judgment, the court is

entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made

admissible in evidence").

　　　　While the non-moving party will bear the burden of proof at trial, the party moving for

summary judgment may meet its burden by showing that the admissible evidence in the record would

be insufficient to carry the non-movant's burden of proof at trial.  *Celotex*, 477 U.S. at 322-323.

Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go

beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions,

or answers to interrogatories showing that there is a genuine issue for trial. *Id.* at 324.   The

nonmoving party "cannot simply reassert factually unsupported allegations contained in its

pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

**B.　　　ERISA Standard of Review**

　　　　The Plaintiff has brought her claim for the wrongful denial of benefits under 29 U.S.C. §

1132 of the ERISA statute, which allows federal causes of action "to recover benefits due to [a

beneficiary] under the terms of his [or her] plan, to enforce his [or her] rights under the terms of the

plan, or to clarify his [or her] rights to future benefits under the terms of the plan."  Normally, a

challenged denial of benefits under section 1132 is reviewed *de novo*, "unless the benefit plan gives

the administrator authority to determine eligibility for benefits or to construe the terms of the plan."

*Firestone Tire & Rubber v. Bruch*, 489 U.S. 101, 115 (1989); *see also Taft v. Equitable Life*

*Assurance Soc'y*, 9 F.3d 1469, 1471 (9th Cir. 1993). In reviewing de novo, a court should defer to the plan administrator's decision and may not reverse that decision unless it was "without reason, unsupported by the substantial evidence or erroneous as a matter of law." *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 393 (3d Cir. 2000); *Jung v. FMC Corp.*, 755 F.2d 708, 711 (9th Cir. 1985). However, where the plan administrator has the discretion to determine eligibility or construe the terms of the plan, or both, a denial of benefits will be reviewed under an arbitrary and capricious standard. *Harris v. Concurrent Techs. Corp. Emple. Benefit Plan*, Civil Action No. 03-145J, 2006 U.S. Dist LEXIS 14121, at *20 (W.D. Pa. Mar. 30, 2006) (citing *Firestone*, 489 U.S. at 115); *see also Micheals v. Equitable Life Assur. Soc'y of the United States*, 2007 U.S. Dist. LEXIS 77060, Civil Action No. 04-3250, at *13-14 (E.D. Pa. Oct. 16, 2007); *Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F.Supp.2d 1222, 1229 (9th Cir. 2003).

Under the arbitrary and capricious standard, "a plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." *Stratton v. E.I. Duponts DeNemours*, 363 F.3d 250, 256 (3d Cir. 2004) (quotation omitted); *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, at 41 (3d Cir. 1993). This scope of review is narrow and a court may not substitute its judgment for that of the plan administrator. *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997). When evaluating an administrator's decision as to benefits, a court must review the "record as a whole...consist[ing] of th[e] evidence that was before the administrator when he made the decision being reviewed." *Mitchell*, 113 F.3d at 440.

Further, when a plan administrator's decision "was potentially affected by a conflict of interest," a heightened arbitrary and capricious standard of review applies. *Harris*, 2006 U.S. Dist

LEXIS 14121, at * 20 (citing *Pinto*, 214 F.3d at 378-79); *Sabatino*, 286 F.Supp.2d at 1230. When an administrator or fiduciary is operating under a conflict of interest, "that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone*, 489 U.S. at 115; *see also Pinto*, 214 F.3d at 383 (quoting RESTATEMENT (SECOND) OF TRUSTS § 187, cmt. d (1959); *Taft*, 9 F.3d at 1474. The United States Court of Appeals for the Third Circuit has "specifically identified that a special danger of a conflict of interest that warrants applying a heightened standard of review arises when a plan is both funded and administered by an administrator outside of the employer company, such as an insurance company." *Harris*, 2006 U.S. Dist LEXIS 14121, at * 21 (citing *Pinto*, 214 F.3d at 388). When faced with such factual situation, the court should use a sliding scale approach to adjust the arbitrary and capricious standard, which "grants the administrator deference in accordance with the level of conflict." *Post v. Hartford Ins. Co.*, 501 F.3d 154, 161 (3d Cir. 2007); *see also Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317, 1322-23 (9th Cir. 1995) (traditional abuse of discretion will be applied "unless affected beneficiary comes forward with further evidence indicating that the conflicting interest caused a breach of the administrator's fiduciary duty"). "The greater the conflict of interest, the less deference the reviewing court should apply." *Harris*, 2006 U.S. Dist LEXIS 14121, at * 22 (citing *Pinto*, 214 F.3d at 393). In making such a determination, a court should also look at the process by which the result was achieved in addition to considering several factors to determine, on a case-by-case basis, what level of scrutiny to apply. *Pinto*, 214 F.3d at 391-92.

In determining where on the sliding scale a case falls, courts should consider both structural and procedural factors, "any of which can provide the basis for closer review." *Micheals*, 2007 U.S. Dist. LEXIS 77060, at *16 (citation omitted). A structural inquiry evaluates whether "the plan is set

up so that the administrator has strong financial incentives to routinely deny claims in close cases." *Id.* at \*16 (quoting *Post* 501 F.3d at 163). This inquiry should specifically determine whether the plan's structure "raises concerns about the administrator's financial incentive to deny coverage improperly." *Id.* Next, courts should review the administrator's actual decision-making process to determine whether any procedural anomalies evidence bias against the claimant, which would give the court "reason to doubt fiduciary neutrality." *Id.* If such procedural irregularities are present, a "more penetrating review of the decision" will be needed. *Id.* Examples of procedural irregularities include: relying on the opinions of non-treating over treating physicians without reason, *Koshiba v. Merck & Co.*, 384 F.3d 58, 67-68 (3d Cir. 2004); failing to show a plan's notification provisions and conducting self-serving paper reviews of medical files, *Lemanna v. Special Agents Mut. Benefits Ass'n.*, Civil Action No. 07-733, 2008 U.S Dist. LEXIS 17977, at \*67 (W.D. Pa. Mar. 6, 2008) (citing *Lemaire v. Hartford Life & Accident Ins. Co.*, 69 Fed. Appx. 88, No. 02-2533, 2003 U.S. App. LEXIS 13421, at \*12 (3d Cir. June 30, 2003); and relying on a favorable part while discarding unfavorable parts in the medical report, *Pinto*, 214 F.3d at 393-94.

In applying the sliding-scale approach, each case must be examined on its facts to determine the measure of scrutiny. *Pinto*, 214 F.3d at 392. In making that determination, the court must consider, *inter alia*, the following factors: (1) the sophistication of the parties, (2) the information accessible to the parties, (3) the exact financial arrangement between the insurer and the company, and (4) the current financial status of the fiduciary. *Id.*

The claimant has the burden of proof to show that his or her case calls for a heightened standard of review. *See Kostrosits v. GATX Corp. Non-Contributory Pension Plan for Salaried Employees*, 970 F.2d 1165, 1174 (3d Cir. 2003) ("Where the sponsor of the plan reserves for the Plan

Administrators the discretion to interpret the plan, anyone urging that the court disregard that reservation has the burden of showing some reason to believe the exercise of discretion has been tainted"); *Sabatino*, 286 F.Supp.2d 1222, 1230. The record available to a court conducting an arbitrary and capricious review is the record made before the plan administrator, which cannot be supplemented during litigation. *Kosiba*, 384 F.3d at 67 n.5 (citing *Mitchell*, 113 F.3d at 440). However, when a court is deciding to apply the arbitrary and capricious standard or a more heightened standard of review, "it may consider evidence of potential biases and conflicts of interests that are not found in the administrator's record." *Hoagland v. Amerihealth Administrators, et al.*, Civil Action No. 05-0099, 2006 U.S. Dist. LEXIS 1570, at *14 (M.D. Pa. Jan. 6, 2006) (citing *Kosiba*, 384 F.3d at 67 n.5)).

Here, the plan clearly grants Liberty discretion to interpret the policy as well as the power to decide eligibility for benefits. (*See* P-22). Because the plan grants Liberty this discretionary authority, an arbitrary and capricious standard should be applied. Furthermore, both parties have agreed that a heightened arbitrary and capricious standard should apply (Docket No. 28, at 11; Docket No. 31, at 9; Docket No. 37, at 2) in reviewing Liberty's decision, though they dispute where on the sliding-scale this case falls.

Having determined that a heightened arbitrary and capricious standard is appropriately employed here, the Court must next determine what "degree of scrutiny" to apply under that standard. *Pinto*, 214 F.3d at 379. First, as to the structural considerations, because the plan is structured in a way that "gives it financial incentives to act against the participants' interest," a heightened form of arbitrary and capricious review appears warranted. Further, Liberty administers the plan by making the initial determinations of eligibility for benefits and draws benefit payments

from its own funds. Therefore, the structure of the plan indicates a conflict that calls for closer scrutiny of the plan administrator's decision. *Michaels,* 2007 U.S. Dist. LEXIS 77060, at *18-19 (citing *Abnathya,* 2 F.3d at 45 n.5). Second, as to the procedural considerations, there are many procedural anomalies present in this case. Liberty's decision to deny or discontinue Plaintiff's claim was at odds with its earlier decision granting long-term disability benefits for Plaintiff's SLE condition. It did not base its reversal on new medical evidence, rather, it based the same on evidence that was available to it during the first review but not obtained until the second review. Additionally, Liberty selectively relied on evidence that supported a denial of benefits, without considering whether the Plaintiff's symptoms and treatment during the pre-existing exclusion period could be attributable to any other condition besides the one for which she was awarded benefits. Defendant relied on the opinions of two doctors, Dr. Millstein and Dr. Collins, who never examined the Plaintiff. Further, in this Court's estimation, Dr. Millstein and Collins did not thoroughly address the Plaintiff's treating physicians opinions. Moreover, Liberty did not afford itself of its right to have the Plaintiff examined by a physician of its choice. Finally, the lack of file notes is troubling to this Court.

Additionally, Liberty's "inconsistency in [its] dealings with the beneficiary" is one piece of evidence that may make a prima facie showing of a breach of fiduciary duty. *Regula v. Delta Family-Care Disability Survivorship Plan*, 266 F.3d 1130, 1146 (9th Cir. 1999), *judgment vacated on other grounds*, 539 U.S. 901 (2003). In *Regula*, the Court applied a less deferential standard of review because of an "unsettling pattern of inconsistency and insufficiency in the plan administrator's reasons for terminating the [claimant]'s benefits." *Regula*, 266 F.3d at 1146. First, benefits were terminated abruptly with no new evidence of any significant change in the claimant's

condition. *Id.* Second, the insurer based its final decision upon reports by physicians whose diagnoses contradicted those of the claimant's own treating physicians. *Id.* at 1147. In light of similar conflicts of interest present in *Regula*, the Court held that the insurer's actions were neither consistent nor sufficiently supported by the record. *Id.*

As a result, the Court finds that a heightened standard of review applies, and while not at the furthest end of the sliding scale, it is toward the less deferential end of the sliding scale. *See Pinto*, 214 F.3d at 393-94 (holding procedural anomalies placed the case at the less deferential end of the scale). With this standard in place, the Court now turns to the specific facts before it at this time.

**V.    Discussion**

The Court reviews the Defendant's decision to discontinue the Plaintiff's benefits using a heightened arbitrary and capricious standard of review towards the less deferential end of the sliding scale. In its review, the Court will evaluate the "record as a whole...consist[ing] of that evidence that was before the [Defendant] when [it] made the decision being reviewed." *Mitchell*, 113 F.3d at 440. Accordingly, the Court has reviewed the entire administrative record in this case as it was before the Defendant on September 2, 2005, the date of the denial of the Plaintiff's appeal.

The Policy states that the governing jurisdiction of the contract is California and the policy is subject to the laws of that state. (P-1).   On October 17, 2007, the Court ordered the parties to submit supplemental briefing discussing the application of California or Ninth Circuit precedents in interpreting the subject policy. Both parties stated in their briefs that the law of California and the Ninth Circuit is consistent with the law of the Third Circuit, which the parties had previously briefed. (Docket No. 47, at 1; Docket No. 46, at 1).   After conducting a review of the pertinent case law, the Court agrees that the applicable law controlling the issues in this case is consistent between the

21

Ninth and Third Circuits.

## A.    Policy Interpretation

The Defendant argues that its denial of the Plaintiff's appeal was proper due to application of the pre-existing condition exclusion.  (Docket No. 28, at 11-12).  It also argues that the initial decision granting benefits was made incorrectly when Ms. Gunn, the first case manager assigned to the claim, asked the wrong question of the reviewing physician, Dr. Karr.  (Docket No. 37-1, at 3). Specifically, Liberty argues that Ms. Gunn incorrectly believed that it was necessary for a diagnosis of SLE to have occurred in the look back period and solely asked the reviewing physician, Dr. Karr, whether SLE was related to the Plaintiff's prior condition, AIH.  (*Id.*).  The Defendant contends that it possessed the authority to correct this mistake 19 months after benefits had been awarded and paid; therefore, its decision was not arbitrary and capricious.  The Plaintiff, on the other hand, argues that the Policy does not contain any provision that gives the Defendant the power to reopen a prior decision on the pre-existing condition exclusion after Liberty had already completed a review under this provision and reached a determination.  (Docket No. 31, at 10-11).  Thus, the Plaintiff contends that the Defendant's actions were improper.

Traditionally, the first step of the analyses would be to determine whether or not Liberty's interpretation of the pre-existing exclusion provision was wrong.   The United States Court of Appeals for the Third Circuit has stated that "[s]traightforward language in an insurance policy should be given its natural meaning."  *Lawson*, 301 F.3d at 162.   According to the rule of *contra proferentem*, any ambiguous terms in the Policy should be strictly construed against the insurer. *Id.* (citing *Medical Protective Co. v. Watkins*, 198 F.3d 100, 105 (3d Cir. 1999)); *see also Winters v. Costco Wholesale Corp.*, 49 F.3d 550 (9th Cir. 1995).  In addition to applying an arbitrary and

capricious standard of review, the United States Court of Appeals for the Ninth and Third Circuits have held that the doctrine of reasonable expectations applies as a principle of federal common law controlling interpretation of ERISA-governed insurance contracts. *Winters*, 49 F.3d 550, 554 (citing *Saltarelli v. Bob Baker Group Medical Trust*, 35 F.3d 382, 387 (9th Cir. 1994)); *see also West v. Lincoln Benefit Life Co.*, 509 F.3d 160, 171-72 (3d Cir. 2007). Exclusionary clauses are construed narrowly against the insurer and all coverage exceptions must be clearly stated to apprise the insured of its effects. *Franceschi v. American Motorists Ins. Co.*, 852 F.2d 1217, 1219 (9th Cir. 1988). If a plan's pre-existing condition exclusion is not "clear, plain, and conspicuous enough to negate the claimant's objectively reasonable expectations of coverage, it [is] unenforceable and the plan [is] liable for the coverage at issue." *Id.* at 387. In assessing whether the Plan was reasonably interpreted by the Defendant, the Court will first look to the plain language of the terms.

The pre-existing condition exclusion in the Policy states that it will not cover any disability or partial disability:

> 1. which is caused or contributed to by, or results from a Pre-Existing Condition; and
> 2. which begins in the first 12 months after the Covered Person's Effective Date.

(P-19). A pre-existing condition is defined as "a condition resulting from an Injury or Sickness for which the Covered Person is diagnosed or received treatment within three months prior to the Covered Person's Effective Date." (*Id.*). Important to this Court's determination is the meaning of "treatment," which is defined as "consultation, care or services provided by a Physician including diagnostic measures and taking prescribed drugs and medicines." (*Id.*). For the most part, the language of the pre-existing condition exclusion is fairly clear and quite broad. It denies coverage for any disability that was pre-existing during the twelve (12) months before coverage. Relevant to

23

our discussion, a condition is pre-existing if the person received a diagnosis for the condition or received treatment in the form of diagnostic measures and taking prescribed drugs and medicines.

Here, the parties do not dispute that the Plaintiff was initially awarded benefits on the determination that she did not suffer from a pre-existing condition. Additionally, the parties do not dispute the terms of the pre-existing condition exclusion. The central issue in the case is whether the Defendant was permitted to re-evaluate the pre-existing condition exclusion to determine that the Plaintiff received treatment for SLE during the look back period, not whether the terms of the pre-existing condition exclusion are ambiguous or unambiguous.

Under the terms of the Policy, the Defendant did not possess the authority to review its initial decision. The Plaintiff was never provided any notice, either in the Policy itself or during the entire claims process, that the Defendant had the authority to conduct a second pre-existing condition exclusion review. The TCMS process is not defined anywhere in the Policy nor was the Plaintiff informed her claim could be re-reviewed by TCMS after she had been awarded benefits. Additionally, the Plaintiff was not notified that her claim was being reviewed by TCMS after it had been referred to TCMS. After a review of the contract as whole, the Court finds that the Policy does not apprise the Plaintiff of the Defendant's right to re-evaluate her claim. Therefore, the Court finds that Fultz could not have reasonably expected that her claim could be re-evaluated over a year after it was decided based upon the pre-existing condition exclusion.

**B.      Pre-Existing Condition Exclusion**

According to Liberty's interpretation of the Policy, any of the symptoms from which the Plaintiff suffered during the exclusionary period could be used as the basis for denying coverage "so long as the symptom was not later deemed inconsistent with" the condition for which benefits are

sought.  *McLeod v. Hartford Life & Ass. Ins. Co.*, 372 F.3d 618, 625 (3d Cir. 2004).  In a case such as this one where the plan administrator is not afforded unlimited discretion, a court must "ensure that the administrator's interpretation of policy language does not unfairly disadvantage the policy holder."  *Id.* at 624.  The purpose of ERISA is to protect the interests of employees in employee benefit plans and "to protect contractually defined benefits." *Id.* (citing *Firestone*, 489 U.S. at 113).  Given that heightened review applied to Liberty's decision, its application of the pre-existing exclusion to the Plaintiff's claim cannot withstand that scrutiny.

In *McLeod*, the United States Court of Appeals for the Third Circuit has made a distinction between pre-existing condition cases that involve a "misdiagnosis" or an "unsuspected condition manifesting non-specific symptoms," and those that involve a "suspected condition without confirmatory diagnosis." *McLeod*, 372 F.3d at 628.  A condition that was neither diagnosed nor suspected in the look back period cannot be deemed a pre-existing condition.  In *McLeod*, the plaintiff, who was eventually diagnosed with multiple sclerosis, had been treated for a number of conditions in the look back period.  However, none of her treating physicians ordered any tests for multiple sclerosis nor suspected that she had the disease.  It was only with hindsight after she had been diagnosed that her physicians were able to make any connection between her symptoms and multiple sclerosis.  *Id.* at 621-22.  The Court of Appeals explained that receiving medical care for a symptom of a pre-existing condition "can only serve as a basis for exclusion from receiving benefits in a situation where there is some intention on the part of the physician or the patient to treat or uncover the underlying condition which is causing the symptom."  *McLeod*, 372 F.3d at 628.  Thus, receiving treatment for symptoms during the exclusionary period can only serve as a basis for exclusion based upon a pre-existing condition "where there is some intention on the part of the

physician or of the patient to treat or uncover the underlying condition which is causing the symptom." *McLeod*, 372 F.3d at 618. The Third Circuit's opinion in *McLeod*, which heavily relied upon *Lawson v. Fortis Ins. Co.*, 301 F.3d 159 (3d Cir. 2002), guides this Court's determination.

Before the Court discusses whether the Plaintiff's benefits were properly denied under the pre-existing condition exclusion after a second review, the Court must determine whether Liberty possessed the authority to re-evaluate her claim through the TCMS process.

There are no claim notes or log entries in Plaintiff's file indicating the reason why her claim was referred to TCMS for a second review. Ms. Mills, the TCMS consultant assigned to her claim, informed the Plaintiff by letter dated September 2, 2005 that Liberty was "not bound to the results of its initial investigation, nor are [they] restricted from performing another pre-existing investigation when the information deems it appropriate." (CF-47). During their initial phone conversation, Ms. Mills informed the Plaintiff that TCMS was reviewing the claim not because "the wrong question was asked of Dr. Karr," as asserted later, but that it was being reviewed because Ms. Mills disagreed with the prior case manager's decision and because she believed there was medical support to find that Fultz suffered from a pre-existing condition. (CF-33-34). At her deposition, Ms. Mills testified that the process undertaken by Ms. Gunn in reaching her decision to award benefits was done correctly. (Mills Depo. p. 25, ll. 18-24, p. 26, ll. 12-13). However, Ms. Gunn failed to do a complete investigation. (*Id.*). She further testified that the reversal decision was completed under paragraph number ten of TCMS's Policy, Procedures, and Exceptions ("PPE"), which outlines customer service and quality standards. (*Id.* at p. 26, ll. 14-18). Specifically, the review was done to promote customer service. (*Id.* at p. 26, ll. 17-20). When asked how many reviews of a claim the Defendant could do, Ms. Mills stated that she did not know how many pre-existing reviews could

be conducted on a single claim. (Mills Depo. p. 85, ll. 19-21). She further stated she did not know how many reviews were permitted by TCMS under their PPE. (*Id.* at p. 86, ll. 7-12).

When asked under what provision of the PPE the claim was being reviewed, Ms. Mills could not give a definite answer. (Mills Depo. p. 38, ll. 8-18). She did, however, provide possible reasons for the referral that were consistent with TCMS's PPE. (*Id.* at p. 43, ll. 21-25, p. 44, ll. 11-19, p. 46, ll. 3-7; Depo. Exh. F). However, she could only provide suppositions as to how the Plaintiff's case fell under these reasons for referral. (*Id.*; *see also* Response to Interrogatory No. 2). Ultimately, Ms. Mills could not state why the claim was selected for TCMS review. (Mill Depo. p. 41, ll. 21-25, p. 43, ll. 3-11). Therefore, in addition to a lack of authority in the Policy granting Liberty the right to engage in a second review, TCMS's PPE did not provide a clear basis for the review. (Mills Depo. p. 61, ll. 15-25, p. 62, ll. 5-8).

Based on the foregoing findings, the Court must next consider whether Liberty's decision to conduct a second review of the Plaintiff's claim was arbitrary and capricious. The Court now addresses this issue.

The Defendant claims that records of treatment by Dr. Franklin provide support for the contention that Fultz received treatment for SLE during the exclusionary period. Dr. Franklin, a heptologist, treated the Plaintiff from December of 2002 through February of 2003. During that time, he ordered numerous blood and lab tests, which the Defendant claims were the types of tests "one would expect to order for suspected SLE." (CF-505-506; Docket No. 28, at 17). However, Dr. Franklin did not indicate anywhere in her records that these procedures were ordered to test whether Fultz was suffering from SLE. (*See* CF-505-509). The Defendant also claims that Prednisone, which was prescribed to Fultz, is a type of steroid frequently used to treat SLE. (Docket No. 28, at 17).

But, again, Dr. Franklin did not record that Prednisone was being prescribed to specifically treat SLE. Rather, his notes indicate it was prescribed to treat her autoimmune hepatitis. (CF-507). The Defendant further cites as support Dr. Franklin's January 29, 2003 handwritten note in the Plaintiff's file indicating an impression of SLE. That note, however, also states autoimmune hepatitis as a possible cause of her then current condition. (CF-504). Dr. Franklin continued to treat Fultz through February of 2003, and nowhere in those treatment records does Dr. Franklin mention SLE again nor did he prescribe medicines or order tests to specifically treat that condition.

Liberty also claims that the records of Dr. Crane "confirm that Ms. Fultz was treated for suspected SLE." (Docket No. 28, at 17-18). Liberty claims that the series of lab tests ordered by Dr. Crane were the types of diagnostic tests used in connection with SLE. (CF-427-429). However, similar to the records of Dr. Franklin, nowhere in his records does Dr. Crane indicate that these procedures were ordered to test for SLE. Dr. Crane ordered additional lab work on February 27, 2003 for the Plaintiff. (CF-423-426). Dr. Crane listed three possible explanations for the result of those tests, which included SLE, rheumatoid arthritis, or nonspecific causes such as old age, drugs, and chronic infections. (CF-425). Contrary to Defendant's claims, these records do not demonstrate that Dr. Crane was using diagnostic measures and prescribing drugs specifically to treat SLE. Rather, these medical procedures were designed to treat a host of symptoms and conditions from which the Plaintiff was suffering.

During the TCMS review, medical records were obtained for the first time from the Plaintiff's primary care physician, Dr. Inkeles, along with pharmacy records from Eckerd and CVS. However, all of these records were available to the Defendant during the initial review by Ms. Gunn. These records, in addition to those of Dr. Franklin and Dr. Crane, were used by Defendant's two

consulting physicians, Dr. Millstein and Dr. Collins, to conclude that she received treatment for SLE in the form of diagnostic measures and taking prescribed medicines. (Docket No. 28, at 16-19).

It may have been evident to the Defendant and its consulting physicians that Fultz suffered from SLE during the look back period. Nevertheless, it was not evident to her treating physicians at the time, who formed their opinions after treating her for months. Furthermore, Liberty was permitted to have the Plaintiff examined by a physician of its choice at its request and expense. (CF -24). It choose not to exercise this power as neither Dr. Millstein nor Dr. Collins examined the Plaintiff. Rather, they based their conclusions solely on review of her medical records. The Plaintiff was not permitted to ask her own questions of Dr. Millstein and Collins. She was also not permitted to present additional medical support for her position during TCMS review.

The consulting physicians did not base their conclusions on new medical evidence. Instead, they reinterpreted the Plaintiff's medical history to answer the question asked of them, that is, whether the Plaintiff received treatment during the exclusionary period for SLE or its symptoms. They were never asked if the Plaintiff's symptoms and treatment could have been attributable to an alternative condition. (Mills Depo. p. 81, ll. 22-27, p. 83, ll. 4-10). It was never asserted by the Defendant that the Plaintiff was diagnosed with SLE during the exclusionary period. Rather, Liberty reversed its initial decision on the basis that the treatment Fultz received during the look back period was for symptoms that could possibly be attributed to SLE.[3] The Court finds, after a review of administrative record and the Plaintiff's medical history, that this case involves an "unsuspected

_____

[3] The Plaintiff further argues that her claim did not meet any of the four ways in which benefits may be terminated, therefore the Policy did not provide a basis for termination. (Docket No. 31, at 13-14). However, as a technical matter, the Defendant did not terminate her benefits. Rather, her benefits were discontinued on the basis that she allegedly should have not been awarded benefits in the first place. Therefore, the Court will not address this argument.

condition manifesting non-specific symptoms," rather than a "suspected condition without confirmatory diagnosis." *McLeod*, 372 F.3d at 628. During the look back period, Plaintiff's treating physicians could have potentially revealed that she was suffering from SLE. Throughout the months before her coverage began, Fultz had been receiving on-going treatment for various other ailments, including AIH. At no time was it ever suspected that she was not receiving proper medical care nor did any of her physicians suspect that her symptoms were specifically the effects of SLE. None of her treating physicians sought to uncover any "underlying condition" that was causing Fultz's symptoms. *Hoagland,* 2006 U.S. Dist. LEXIS 1570, at \*27. Additionally, her medical records do not reflect that her treating physicians suspected SLE. Thus, this Court finds that "[i]t is not logical to permit non-specific symptoms which could be caused by a number of different sicknesses, to be used later as a retroactive trigger for exclusion as a pre-existing condition." *Lawson*, 301 F.3d at 164. In *Lawson,* the United States Court of Appeals for the Third Circuit noted that:

> [C]onsidering treatment for symptoms of a not-yet diagnosed condition as equivalent to treatment of the underlying condition ultimately diagnosed might open the door for insurance companies to deny coverage for any condition the symptoms of which were treated during the exclusionary period. To permit such backward-looking reinterpretation of symptoms to support claims denials would so greatly expand the definition of preexisting condition as to make that term meaningless: any prior symptom not inconsistent with the ultimate diagnosis would provide a basis for denial.

*Lawson*, 301 F.3d at 166 (quotation omitted).Therefore, the Court finds that the Defendant's reversal of Fultz's award granting benefits was arbitrary and capricious.

### C. Federal Regulations Governing ERISA Claims

The Plaintiff argues that the Defendant, in establishing the instant policy, failed to adhere to the regulations governing ERISA claims procedures as set forth in 29 C.F.R. § 2560.503-1 (2001).

(Docket No. 31, at 19). Specifically, the Plaintiff claims that Liberty failed to provide a description of all claims procedures under 29 C.F.R. § 2560.503-1(b)(2), and failed to follow the time limits for claim denials under 29 C.F.R. § 2560.503-1(f)(1) and (3). (*Id.* at 20).

The ERISA claims procedure regulations provide the minimum requirements for employee benefit plan procedures pertaining to claims for benefits. 29 C.F.R. § 2560.503.1(a). The regulations require that employee benefit plans "establish and maintain reasonable procedures governing the filing of claims, notification of benefit determinations, and appeal of adverse" decision. 29 C.F.R. § 2560.503.1(b). This is to ensure that all claim denials are given a full and fair review. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 220 (2004) (these regulations apply equally to health benefit plans and other plans, and do not draw distinctions between medical and nonmedical benefits determinations); *see also Pacconi v. Trs. of UMW, Health & Retirement Fund of 1974*, Civil Action No. 06-4799, 2008 U.S. App. LEXIS 3035, at *3 (3d Cir. Feb. 11, 2008); *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 971 (9th Cir. 2006). Under 29 C.F.R. § 2560.503.1(b)(2), the regulation requires that all plans provide a description of all claims procedures. Additionally, it requires that all claims procedures "contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents." 29 C.F.R. § 2560.503.1(b)(5). Under 29 C.F.R. § 2560.503.1(f)(3), in the case of a claim for disability benefits, a claimant shall be notified of an adverse benefit determination within a reasonable time, but no later than 45 days after receipt of the claim by the plan.

The Policy did contain a written description of the claim procedures to be followed by the parties, however, there was nothing in those terms that described the TCMS review process or who and why a claim would be chosen for that review. The claimant was never provided any

documentation throughout the initial claim review that discussed the TCMS referral process. Thus, the Defendant failed to adhere to 29 C.F.R. § 2560.503.1(b)(2), requiring a description of *all* claims procedures. Furthermore, the Defendant violated the time limit regulations. The second evaluation did not begin until ten months after Fultz's claim was approved and thirteen months after it was initially filed. The decision to overturn her benefit award was made outside the time limitations set forth in the regulations. Therefore, this Court finds that the Defendant's actions in violating 29 C.F.R. § 2560.503.1 were arbitrary and capricious.

### D.    Waiver

The Defendant contends that the Plaintiff's position that Liberty was precluded from re-examining the pre-existing condition exclusion based upon its first decision to approve the claim "can only be characterized as a 'waiver' argument." (Docket No. 37-1, at 3). A waiver is "a voluntary and intentional relinquishment of a known right." J. CALAMARI AND J. PERILLO, THE LAW OF CONTRACTS § 11-29(c) at 491 (3d ed. 1987); *LeBoon v. Lancaster Jewish Cmty. Cntr. Ass'n.*, 503 F.3d 217, 225 (3d Cir. 2007) (citing *United States v. Olano*, 507 U.S. 725, 733 (1993)); *see also Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1278-79 (9th Cir. 2006). In the area of insurance law, waiver applies to those cases where the insurer is aware that it has "valid grounds for rescission of the policy or defense to any claim on the policy, and expressly or impliedly...conveys to the insured its *voluntary* surrender of such right." JOHN F. DOBBYN, INSURANCE LAW 322 (4th ed. West Publishing Co. 1996).

Liberty claims that nothing in ERISA or the Policy itself prevented it from correcting its alleged error in initially approving benefits. The Defendant was aware of the Policy's provisions and followed those provisions in initially granting benefits. However, there is nothing in the Policy

32

which provides notice to the Plaintiff that Liberty had the authority to re-evaluate whether the pre-existing condition exclusion applied to her claim, overturn a prior decision, and discontinue payments. The Plaintiff is not arguing that the Defendant waived any right, instead, she is arguing that the Defendant had the opportunity to do a full and complete pre-existing exclusion review in the first instance. (Docket No. 35, at 3). Furthermore, Liberty did not have authority under the terms of the Policy to conduct a second review and the initial decision should have been "conclusive and binding" on both parties according to the terms of the Policy. (*Id.* at 3-4).

Here, the requirements of waiver have not been met. Liberty exercised its right to do a full and complete review of Plaintiff's claim and then made a decision to award benefits. Defendant did not waive any right to a second a review because such a right was not granted to Liberty under the Policy. This is not a situation where the insured knew of a Policy provision or defense and voluntarily chose not to pursue it. Thus, the Court finds that Plaintiff's argument that the Defendant wrongfully discontinued her benefits based upon an after-the-fact review does not constitute a waiver argument**.**

**VI.** **Conclusion**

After a careful review of the record, the Court finds as follows. The pre-existing condition exclusion, along with the other general provisions of the Policy, did not provide the Defendant-insurer, Liberty, with the power to conduct multiple reviews of one claim. Furthermore, the Defendant's actions throughout the course of the claims process were inconsistent. The Plaintiff was not notified until over two months after the TCMS review process began that her claim was being re-evaluated. Additionally, no claim notes or logs were ever entered into her file indicating the precise reason for the review. The consulting physicians employed during the second review never

personally examined the Plaintiff nor did they base their reports on new medical evidence. The Defendant had the opportunity to do a full and complete review when the claim was initially filed and did so. It is not reasonable for the Plaintiff to expect that her benefits would end because the Defendant made errors during the first review process. For the foregoing reasons, this Court finds that the Defendant's action in discontinuing the Plaintiff's LTD benefits based upon an unauthorized second review of the application of the pre-existing condition exclusion to her claim were arbitrary and capricious.

Accordingly, this 16th day of April, 2008, upon all of the papers filed by the parties, and oral argument heard on the motions by the Court at the status conference held on September 20, 2007, the Court DENIES the Defendant's Motion for Summary Judgment [27] and GRANTS the Plaintiff's Motion for Summary Judgment [30]. An appropriate Order follows.

*/s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

cc/ecf: All Counsel of Record